UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| ANGELA C. JOHNSON, | ) | |
|---|---|---|
| Plaintiff, | ) ) ) | |
| v. | ) ) | No. 4: 18 CV 574 DDN |
| NANCY A. BERRYHILL,<br>Acting Commissioner of Social Security, | ) ) ) ) | |
| Defendant. | ) | |

## **MEMORANDUM**

This action is before the court for judicial review of the final decision of the defendant Commissioner of Social Security denying the applications of plaintiff Angela C. Johnson for disability insurance benefits under Title II of the Social Security Act (Act), 42 U.S.C. §§ 401-434, and for supplemental security income benefits under Title XVI of the Act, 42 U.S.C. §§ 1381-1385. The parties have consented to the exercise of plenary authority by the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). For the reasons set forth below, the final decision of the Commissioner is reversed and remanded.

## **I. BACKGROUND**

Plaintiff was born on August 12, 1975 and was 42 years old at the time of her hearing. She filed her applications on September 16, 2016, alleging a July 17, 2014 onset date and alleging disability due to back problems, fibromyalgia, anxiety, and depression. (Tr. 90-91, 195-207.) Her applications were denied, and she requested a hearing before an Administrative Law Judge (ALJ). (Tr. 94-107.)

On December 20, 2017, following a hearing, an ALJ issued a decision finding that plaintiff was not disabled under the Act. (Tr. 15-29.) The Appeals Council denied her

request for review. (Tr. 1-3.) Thus, the decision of the ALJ stands as the final decision of the Commissioner.

## II. ADMINISTRATIVE RECORD

The following is a summary of plaintiff's medical and other history relevant to this appeal.

On September 23, 2012, an MRI of plaintiff's lumbar spine revealed degenerative disease at L5-S1, including a disk bulge with moderate central disk herniation/protrusion, without associated nerve root impingement or central canal stenosis; and mild bilateral neural foraminal stenosis or narrowing. Thomas F. Lieb, M.D., a physical medicine and rehabilitation specialist, noted plaintiff "certainly has the degenerative changes at the L5-S1 level. These are fairly significant with a moderate central bulge.… I certainly think this is the source of her back discomfort." (Tr. 339-40.)

On August 1, 2013, plaintiff was seen by Frederic A. Prater, D.O., family practitioner. Plaintiff stated that she was under a lot of stress in her new job. She reported difficulty staying on task while in a negative work environment, which exacerbated her difficulty in learning new tasks. Dr. Prater assessed fatigue, ADD, and anxiety. He prescribed Adderall for ADD and lorazepam for anxiety. (Tr. 418-19.)

Plaintiff was treated by Richard M. DiValerio, M.D., a rheumatologist, on a regular basis from February 2014 through August 2017. During a February 25, 2014 office visit plaintiff reported degenerative disk disease in her low back originating from a fall off of a roof at age 13; chronic low back pain; chronic, mild anxiety; fatigue; diffuse joint and muscle pain; and thinning hair. She smoked a pack of cigarettes per day and had a smoker's cough. She was working two jobs for up to sixteen hours per day. She had some mild trigger point tenderness at the elbows, shoulders, posterior neck, and knees. Dr. Di Valerio diagnosed possible fibromyalgia, fatigue, and low back pain, and prescribed Xanax. (Tr. 383-84.)

During an August 7, 2014 follow-up visit with Dr. DiValerio, plaintiff reported that she was about the same. She had a lot of stress at work, constant and severe chronic low back pain, and joint pain. On physical examination, she was in no acute distress. Her mood was normal and her affect was appropriate. Her insight and judgment were intact. Dr. Di Valerio noted slight tenderness to palpation of her spine. He diagnosed joint pain, and anxiety and long-term, current drug use from prescription narcotics. He prescribed hydrocodone and Xanax. (Tr. 377-78.)

On February 13, 2015, plaintiff was doing about the same. She reported chronic low back pain, as well as continued fatigue and stress. Xanax helped her with stress. On physical examination, Dr. DiValerio noted slight tenderness to palpation of her spine. Her gait was normal. He diagnosed long-term, current drug use, arthralgia, fibromyalgia, and joint pain. He prescribed a fentanyl transdermal patch and hydrocodone. (Tr. 374-75.)

On May 21, 2015, plaintiff reported that her energy and sleep were not great. She had continued chronic low back pain, joint pain, and fatigue. Her stress levels were still high. She reported that she had recently fallen in the shower and felt a "pop" in her lower back. Her physical examination was normal. Dr. DiValerio refilled her Xanax, hydrocodone, and Adderall. (Tr. 372-73.)

During a September 4, 2015 appointment, plaintiff reported diffuse joint and muscle pain and fatigue. Her medication was providing partial relief. Examination revealed a normal mood and affect, intact insight and judgment, no tenderness, full motor strength and range of motion in her upper extremities, and a normal gait. Dr. DiValerio diagnosed long-term, current drug use, arthralgia, and fibromyalgia. He prescribed oxycodone, hydrocodone, and Xanax. (Tr. 370-71.)

On December 1, 2015, plaintiff reported that she had pain, fatigue, and depression. Her sleep and energy were poor; she had diffuse joint and muscle pain, and severe low back pain. Dr. DiValerio observed that her mood and affect were tearful. Dr. DiValerio found no tenderness, weakness, or atrophy, and a normal gait. He diagnosed long-term,

current drug use, arthralgia, cough, fibromyalgia, and back pain. He refilled her medications and added an antibiotic for her cough. (Tr. 367-68.)

On February 25, 2016, plaintiff reported chronic, diffuse, severe, joint and muscle pain. Her energy and sleep were poor. Her anxiety and depression were uncontrolled. She was involved in a lawsuit and was experiencing significant stress and anxiety. Her low back pain was severe and she had difficulty sleeping. On physical examination, Dr. DiValerio noted her mood and affect were tearful. She had no tender or trigger points. She had full range of motion and motor strength in all of her extremities, and her gait was normal. He diagnosed long-term, current drug use, cough, fatigue, fibromyalgia, and joint pain. He refilled Xanax and oxycodone. (Tr. 364-66.)

On May 20, 2016, plaintiff was the same. On physical examination, Dr. DiValerio noted her mood and affect were tearful and her hand grips were poor. Her lower back pain was chronic and constant. Her energy and sleep were not great. Her pain seemed worse overall. Dr. DiValerio refilled plaintiff's oxycodone. (Tr. 362-63.)

On August 12, 2016, plaintiff reported significant stress from her lawsuit and that her low back pain was worse than ever. Her energy level and sleep were poor. She reported chronic, diffuse pain. She had intermittent tingling in the arms and legs and fatigue. Dr. DiValerio noted her mood and affect were tearful. She was alert and in no acute distress. She had no tenderness, weakness, or atrophy, and full range of motion and a normal gait. He diagnosed fibromyalgia, back pain, joint pain and stress. He refilled oxycodone and Xanax. (Tr. 360-61.)

On November 4, 2016, plaintiff reported she felt the same. She had chronic, severe, diffuse, musculoskeletal pain. She was alert and in no acute distress. Her mental status was normal with a normal mood, appropriate affect, and intact insight and judgment. She had slight tenderness to palpation of her cervical spine, but her examination was otherwise normal, with full range of motion in all extremities and no

tenderness, weakness, or atrophy. Her gait was normal. He refilled her oxycodone. (Tr. 357-58.)

On December 16, 2016, Veronica Weston, MD, an internist, performed a consultative evaluation. (Tr. 391-400.) Plaintiff reported she had stopped working June 2014 because she was fired. She reported a history of treatment for back pain. She reported using a cane for the past six months to relieve left-sided pressure. She reported difficulty sleeping. She cannot perform household chores. It takes her two hours to grocery shop. She is able to microwave food and do small loads of laundry. She showers only once a week because of her pain.

On physical examination, Dr. Weston noted that plaintiff was in no acute distress. However, she changed positions frequently during the examination complaining of pain. On physical exam there was tenderness to palpation along the lower thoracic to lumbosacral spine, left greater than right. There was paraspinal muscle tenderness and decreased range of motion of the lumbar spine. Her gait was antalgic (weight bearing) to the left. She had full range of motion of her neck. Plaintiff walked with the left leg stiff-walking on the tips of the toes. She held the cane with the left hand and got on and off the examination table slowly. She moved around the room slowly. There was no muscle atrophy. She had full range of motion in all joints except her lumbar spine. Her muscle strength was 5/5 except that in her left thigh, knee and extensor and flexor muscle groups it was reduced to 3/5. An X-ray showed degenerative disk disease at L5, S1. (Tr. 391-95.)

The same day, plaintiff underwent a consultative psychological evaluation performed by Kirmach Natani, Ph.D. Plaintiff told Dr. Natani that she had to quit her last job due to back pain. Plaintiff stated that back pain has destroyed her life. Her speech was interrupted at times by crying. She was very frustrated and sad, but not angry, about her condition. Her mood was dysthymic (persistent mild depression) with congruent affect. She reported some PTSD symptoms with nightmares and flashback from trauma in

her childhood. She had fair insight and judgment. She does few chores and leaves the house only for groceries. She rarely drives. She bathes infrequently. Dr. Natani observed persistence was fair and pace was slow. He diagnosed PTSD related to life in a dysfunctional family and rape at twelve years of age in foster care; mood disorder due to a general medical condition; anxiety disorder due to a general medical condition; and chronic pain syndrome with prescription opiate use. He described her prognosis as guarded. He assigned a GAF score of 45, characterized by marked symptoms related to PTSD, anxiety, and depression. (Tr. 402-06.)

On January 27, 2017, plaintiff saw Dr. DiValerio for follow-up. She was fatigued. Her examination was largely unchanged, with slight tenderness of her cervical spine, but no tenderness in her extremities, atrophy, normal range of motion, and normal gait. Dr. DiValerio prescribed oxycodone and added Amitriptyline, an anti-depressant, due to her poor response to therapy. (Tr. 408, 427-28.)

On February 15, 2017, Dr. DiValerio completed a medical source statement. He diagnosed fibromyalgia syndrome and described plaintiff's prognosis as "guarded." Her symptoms included fatigue, cognitive deficits, weakness, unstable walking, increased muscle tension/spasm, impaired sleep, pain and depression. Dr. DiValerio opined that plaintiff could sit less than two (2) hours in an eight (8) hour workday and that she could stand/walk less two (2) hours in an eight (8) hour workday. She would need to shift positions at will from sitting, standing and walking. She would need unscheduled breaks during an eight (8) hour workday. She could rarely lift less than ten (10) pounds. Dr. DiValerio believed that emotional factors contributed to plaintiff's symptoms and functional limitations and that her pain was severe enough to constantly interfere with attention and concentration. He believed that plaintiff had a severe limitation in her ability to deal with work stress. She would be expected to be off task more than twenty percent (20%) of an eight (8) hour workday and would miss more than three (3) days of

work per month due to chronic pain, fatigue and cognitive dysfunction. Dr. DiValerio cited his clinical assessment in support of his opinions. (Tr. 410-11.)

During an April 21, 2017 follow-up appointment with Dr. DiValerio, plaintiff had no paraspinal muscle tenderness and no tender or trigger points. Her mood and affect were normal and her insight and judgment were intact. Her examination was largely unchanged, with slight tenderness of her cervical spine, but no tenderness in her extremities, no atrophy, a normal range of motion, and a normal gait. (Tr. 430-31.)

Plaintiff saw Andrea Martin, physician's assistant, in Dr. DiValerio's office on July 17, 2017, for acute bronchitis. Plaintiff reported severe back pain; tingling arms; fatigue; anxiety/depression; constant, severe and diffuse pain; and joint pain. Ms. Martin diagnosed long-term current drug use, arthralgia, fatigue, fibromyalgia, joint pain, and anxiety. (Tr. 433-34.)

On August 15, 2017, plaintiff reported chronic musculoskeletal pain, fatigue, depression, poor sleep, stress, severe low back pain, anxiety, and joint pain. Dr. DiValerio noted tenderness to palpation of her spine; poor hand grip, bilaterally; and that plaintiff ambulated with a limp. He refilled oxycodone. (Tr. 436-37.)

In August 15, 2017 correspondence to plaintiff's lawyer, Dr. DiValerio supported plaintiff's request for an expedited hearing. Dr. DiValerio wrote:

> [Plaintiff] is under severe financial distress. She is unable to hold gainful employment because of severe constant chronic and diffuse musculoskeletal pain, weakness, fatigue and cognitive dysfunction. She also has chronic anxiety and depression. She is on prescription medication for these issues, which are only giving minimal relief of symptoms.… I hope that she can be considered a hardship case and her hearing moved up to a more reasonable time.

(Tr. 425.)

**ALJ Hearing**

On December 8, 2017, plaintiff appeared and testified to the following at a hearing before an ALJ. (Tr. 35-59.) She is exhausted and sleeps only three hours a night. She is

- 7 -

up and down most of the day and shifts position frequently to take pressure off her lower back. She uses a cane all of the time except in the grocery store, when she leans on the shopping cart. She has a TENS unit that helps her back, but aggravates her fibromyalgia. (Tr. 46-47.)

She has panic attacks twice a day, triggered by stress, finances, and the fact that she cannot take care of herself anymore. During her panic attacks, she gets very sweaty and hot and is unable to stop crying. She is always exhausted. She was emotionally and physically abused as a child and removed from the family home to live in foster care. Her entire day is focused on trying to get as comfortable as possible, including moving from sitting, standing, lying down, and sitting in different positions. (Tr. 50-53.)

A vocational expert also testified at the hearing. The ALJ asked the vocational expert whether jobs existed in the national economy for an individual with plaintiff's age, education, work experience, and residual functional capacity. The vocational expert testified that such an individual would be able to perform jobs such as optical goods examiner, medical supplies packer, and document preparer. (Tr. 55-59.)

### III.   DECISION OF THE ALJ

On December 20, 2017, the ALJ issued a decision finding that plaintiff was not disabled. (Tr. 15-29.) At Step One, the ALJ found that plaintiff had not performed substantial gainful activity since July 17, 2014, her alleged onset date of disability. At Step Two, the ALJ found that plaintiff had the severe impairments of degenerative disk disease, anxiety disorder, mood disorder, attention deficit disorder (ADD), and post-traumatic stress disorder (PTSD). (Tr. 18.) At Step Three, the ALJ found that plaintiff did not have an impairment or combination of impairments that met or medically equaled an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1. (Tr. 20-21.)

The ALJ found that plaintiff had the residual functional capacity (RFC) to perform light work with the following limitations. She can occasionally climb ramps and stairs,

but never climb ladders, ropes, or scaffolds. She can occasionally stoop, kneel, crouch and crawl. She is unable to operate any foot control operations. She required a sit/stand option every 30 minutes throughout an eight-hour workday while remaining on task. She must avoid extreme vibration, all operational control of moving machinery, working at unprotected heights, and the use of hazardous machinery. She is limited to occupations that involve only simple, routine and repetitive tasks in a low stress job, defined as requiring only occasional decision making and only occasional changes in the work setting. She must have no contact with the public and only casual and infrequent contact with coworkers. Contact with supervisors concerning work duties (when work duties are being performed satisfactorily) must occur no more than four times per workday. (Tr. 21-22.)

With this RFC, the ALJ found that plaintiff was unable to perform past relevant work. At Step Five, the ALJ found, however, there were jobs that exist in significant numbers in the national economy that she could perform. The ALJ therefore concluded that plaintiff was not "disabled" under the Act. (Tr. 28-29.)

## IV. GENERAL LEGAL PRINCIPLES

The Court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings apply the relevant legal standards to facts that are supported by substantial evidence in the record as a whole. *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009). "Substantial evidence is less than preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Id.* In determining whether the evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision. *Id.* As long as substantial evidence supports the decision, the Court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the Court

would have decided the case differently. *See Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove she is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months. 42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A); *Pate-Fires*, 564 F.3d at 942. A five-step regulatory framework is used to determine whether an individual is disabled. 20 C.F.R. § 404.1520(a)(4); *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987) (describing five-step process).

Steps One through Three require the claimant to prove: (1) she is not currently engaged in substantial gainful activity; (2) she suffers from a severe impairment; and (3) her condition meets or equals a listed impairment. 20 C.F.R. § 404.1520(a)(4)(i)-(iii). If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to Steps Four and Five. Step Four requires the Commissioner to consider whether the claimant retains the RFC to perform past relevant work (PRW). *Id.* § 404.1520(a)(4)(iv). The claimant bears the burden of demonstrating she is no longer able to return to her PRW. *Pate-Fires*, 564 F.3d at 942. If the Commissioner determines the claimant cannot return to her PRW, the burden shifts to the Commissioner at Step Five to show the claimant retains the RFC to perform other work that exists in significant numbers in the national economy. *Id.*; 20 C.F.R. § 404.1520(a)(4)(v).

## V. DISCUSSION

Plaintiff argues the ALJ erred in failing to properly evaluate the opinion evidence of treating source and rheumatologist, Dr. Richard M. DiValerio. Plaintiff argues the ALJ erred in not giving Dr. DiValerio's opinion significant if not controlling weight. She contends the ALJ failed to provide sufficient reasons for giving little weight to his

opinion, citing, among other things, the factors set forth in 20 C.F.R. § 404.1527 for analyzing medical opinion evidence. She also argues the ALJ erred at Step Two of the sequential evaluation in not finding her fibromyalgia was severe. The Court agrees with plaintiff as to both arguments.

### Treating Rheumatologist Richard M. DiValerio, M.D.

On February 15, 2017, Dr. DiValerio completed a medical source statement. He described plaintiff's prognosis as "guarded." Her symptoms included fatigue, cognitive deficits, weakness, unstable walking, increased muscle tension/spasm, impaired sleep, pain and depression. Dr. DiValerio opined that plaintiff could sit less than two (2) hours in an eight (8) hour workday and she could stand/walk less than two (2) hours in an eight (8) hour workday. She would need to shift positions at will from sitting, standing, and walking. She would need unscheduled breaks during an eight (8) hour workday. She could rarely lift less than ten (10) pounds. Dr. DiValerio believed that emotional factors contributed to plaintiff's symptoms and functional limitations and that her pain was severe enough to constantly interfere with attention and concentration. He believed that plaintiff had a severe limitation in her ability to deal with work stress. She would be expected to be off task more than twenty percent (20%) of an eight (8) hour workday and would miss more than three (3) days of work per month secondary to chronic pain, fatigue, and cognitive dysfunction. Dr. DiValerio cited his clinical assessment in support of his opinion. (Tr. 410-11.)

The opinion of a treating physician controls if it is well supported by medically acceptable diagnostic techniques and is not inconsistent with the other substantial evidence. *Prosch v. Astrue*, 201 F.3d 1010, 1012-13 (8th Cir. 2012) (mirroring language of 20 C.F.R. §§ 404.1527 and 416.927). The treating source's opinion is not inherently entitled to controlling weight, however. *Blackburn v. Colvin*, 761 F.3d 853, 860 (8th Cir. 2000). Even if the opinion is not entitled to controlling weight, it should not ordinarily be

disregarded and is entitled to substantial weight. *Singh v. Apfel*, 222 F.3d 448, 452 (8th Cir. 2000).

The Eighth Circuit generally gives greater weight to the opinion of a specialist about medical issues in the area of specialty. *Brown v. Astrue*, 611 F.3d 941, 953 (8th Cir. 2010). In assessing a medical opinion, an ALJ may consider factors including the length of the treatment relationship and the frequency of examination, the nature and extent of treatment relationship, supportability with relevant medical evidence, consistency between the opinion and the record as a whole, the physician's status as a specialist, and any other relevant factors brought to the attention of the ALJ. See 20 C.F.R. § 404.1527(c)(1)-(6); *Owns v. Astrue*, 551 F.3d 792, 800 (8th Cir. 2008) (holding that when a treating physician's opinion is not entitled to controlling weight, the ALJ must consider several factors when assessing the weight to give it). Although an ALJ is not required to discuss all the factors in determining what weight to give a physician's opinion, the ALJ must explain the weight given the opinion and give "good reasons" for doing so. *See* 20 C.F.R. § 404.1527(c)(2).

The ALJ did not provide good reasons here. The ALJ stated that he gave little weight to Dr. Di Valerio's opinion because it was inconsistent with the record as a whole and with his treatment notes. For example, the ALJ found that plaintiff was able to work two jobs for up to sixteen hours per day. However, the ALJ's statement referenced a treatment note dated February 25, 2014 that predated plaintiff's July 17, 2014 alleged onset date by almost five months. (Tr. 26, 383.) The ALJ also referred to records from Dr. Thomas F. Lieb from 2012 that predated plaintiff's onset date by almost two years. The ALJ referred to a note by Dr. Lieb that plaintiff planned to travel to Texas for two weeks in October 2012 that again predated plaintiff's onset date. (Tr. 23, 339.) Plaintiff's anticipated travel in October 2012 provides no support for the conclusion that plaintiff could maintain full time work either before or after July 2014. The ALJ also referenced a March 28, 2012 treatment note from Dr. Lieb, when plaintiff reported that she was pleased

that she was obtaining employment. (Tr. 23, 336.) The ALJ cited plaintiff's comment as support that she could work. Again, this treatment note from 2012 predated plaintiff's alleged onset date. The ALJ also neglected to mention that although Dr. Lieb noted in July 2012 that plaintiff was enjoying her work, at the same time her employment had caused an increase in her discomfort, and her pain control was only fair. (Tr. 337.) Thus, the ALJ failed to consider that work activity in 2012 increased plaintiff's pain and limitation.

The ALJ also stated that the record evidence showed that plaintiff was not compliant with respect to medication and treatment recommendations, and that when compliant, her impairments were controlled. The ALJ stated he found it inconsistent that an individual "truly desirous of work," would repeatedly fail to comply with prescribed treatment for ailments that she feels are significantly limiting his/her functional capacity. (Tr. 27.) However, the ALJ did not list any example of non-compliance during plaintiff's period of disability. The ALJ did not indicate consideration of the record evidence described above, as well as the variable nature of her impairments, to arrive at his conclusions.

This Court finds the ALJ made his credibility determination based on outdated and inaccurate evidence, which consequently affected his other findings, such as the decision to discredit the opinion of Dr. DiValerio.

There must be a "principled reason to reject" a treating physician's opinion, even if offered in a Medical Source Statement. *Reed v. Barnhart*, 399 F.3d 917, 921 (8th Cir. 2005). "A treating physician's opinion should not ordinarily be disregarded and is entitled to substantial weight." *Singh v. Apfel*, 222 F.3d 448, 452 (8th Cir. 2000). Here, the ALJ's references to outdated and inaccurate conflicting underlying medical evidence is insufficient to meet the articulation required of an ALJ weighing treating physician opinions.

The ALJ also failed to evaluate the opinion of Dr. DiValerio using the checklist of factors in 20 CFR § 404.1527(c)(2). For example, plaintiff saw Dr. DiValerio on a regular basis for more than three years. *See* 20 CFR § 404.1527 (c)(1-4). He was therefore familiar with the severity of plaintiff's longitudinal physical and emotional pain. Dr. DiValerio also provided the only medical opinion in evidence to address plaintiff's ability to function in the workplace. Since the ALJ discredited the medical opinion from Dr. DiValerio, it is unclear on what basis the ALJ made his RFC assessment.

Since the ALJ failed to properly evaluate opinion evidence, which led to an unsupportable RFC assessment, the hearing decision is not supported by substantial evidence. This case is remanded for reconsideration of Dr. DiValerio's opinion using the factors set forth in 20 C.F.R. § 404.1527 for analyzing medical opinion evidence. *See* 20 CFR § 404.1527(c)(6) (factors to consider include length and frequency of physician-patient relationship, the nature and extent of the treatment relationship, supportability, consistency, expertise, and other factors.) The ALJ shall then reevaluate plaintiff's RFC, and, if necessary consult with a vocational expert regarding all of the limitations supported by the evidence.

### Fibromyalgia as a Severe Impairment at Step Two

Plaintiff next argues the ALJ erred in failing to find her fibromyalgia a severe impairment at Step Two. She argues the evidence as a whole supports the diagnosis of fibromyalgia syndrome. She argues that she consistently reported symptoms consistent with fibromyalgia, including fatigue, sleep disturbance, mood, cognitive problems, and unrefreshed sleep. The Court agrees.

At Step Two of the evaluation process, the ALJ must determine if a claimant suffers from a severe impairment. *Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007). The claimant bears the burden of proving her impairment or combination of impairments is severe, but the burden is not a heavy one. *Id.; Dewald v. Astrue*, 590 F. Supp.2d 1184, 1200 (D.S.D. 2008). "Severity is not an onerous requirement for the claimant to meet, but

it is also not a toothless standard. . . ." *Kirby*, 500 F.3d at 707. A severe impairment is an impairment or combination of impairments that significantly limits a claimant's physical or mental ability to perform basic work activities. See 20 C.F.R. § 404.1520(c). An impairment is not severe if it amounts to only a slight abnormality and does not significantly limit the claimant's physical or mental ability to do basic work activities. Kirby, 500 F.3d at 707; 20 C.F.R. § 404.1522. Basic work activities concern the abilities and aptitudes necessary to perform most jobs. 20 C.F.R. § 404.1522. Examples of basic work activities include: (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers, and usual work situations; and (6) dealing with changes in a routine work setting. Id. The sequential evaluation process terminates at Step Two if the impairment has no more than a minimal effect on the claimant's ability to work. *Kirby*, 500 F.3d at 707.

Here, the ALJ determined at Step Two that plaintiff's fibromyalgia was not a severe impairment. (Tr. 18-20.) The ALJ agreed that a medical professional diagnosed fibromyalgia and that treatment notes provided a history of widespread pain that persisted for three months. The ALJ found, however, that plaintiff did not have eleven or more trigger points; doctors did not exclude coexisting conditions; and plaintiff's pain was not severe enough to, "preclude use of full strength or full motion or from engaging in a normal gait…and to avoid muscle disuse and atrophy." (Tr. 20.)

The ALJ's evaluation of fibromyalgia is inaccurate. The diagnosis of fibromyalgia by a doctor bolsters the credibility of a complaint. *Foley v. Barnhart*, 432 F.Supp. 2d 465, 480 (M.D. Pa. 2005). Specialized knowledge is particularly important with respect to a disease such as fibromyalgia, which is poorly understood within much of the medical community. *Contreras v. Astrue*, 378 Fed. Appx. 656, 658 (9th Cir. 2010). In the case of fibromyalgia, the relevant specialty is rheumatology. *Jordan v. Northropp Grumman*

*Corp., Welfare Benefit Plan*, 370 F.3d 869 (9th Cir. 2004). Greater weight is given if the doctor is a rheumatologist. *Benecke v. Barnhart*, 379 F.3d 587, 594 n.4 (9th Cir. 2004).

In this case, plaintiff was repeatedly diagnosed with fibromyalgia by Dr. DiValerio, a rheumatologist. Moreover, the record is clear that the ALJ failed to recognize some of the actual criteria of fibromyalgia, namely fatigue, sleep disturbance, mood, cognitive problems, somatic symptoms, and unrefreshed sleep. Plaintiff consistently reported these symptoms to her treating and examining physicians as detailed above. Given the low standard for determining impairment severity, the ALJ erred at Step Two of the sequential evaluation process. Further, substantial evidence unequivocally supports a finding that plaintiff's fibromyalgia impairment is severe. The Court reverses the final decision of the defendant Commissioner and remands the case for general reconsideration of plaintiff's disability applications with her fibromyalgia impairment considered severe.

## VI. CONCLUSION

For the reasons set forth above, the decision of the Commissioner of Social Security is reversed and remanded. An appropriate Judgment Order is issued herewith.


       /s/ David D. Noce       
**UNITED STATES MAGISTRATE JUDGE**

Signed on May 29, 2019.